Electronically Filed: 3/3/2026 2:22 PM

**EXHIBIT A**

STATE OF MAINE                                    SUPERIOR COURT
PENOBSCOT, ss.                                    Civil Action
                                                  Docket No.

PENOBSCOT COMMUNITY      )
HEALTH CENTER,           )
                         )
    Plaintiff            )
                         )
    v.                   )         **COMPLAINT AND DEMAND**
                         )            **FOR JURY TRIAL**
                         )
COMMUNITY CARE           )
PARTNERSHP OF MAINE,     )
LLC                      )
                         )
    Defendant            )
                         )
                         )

The Plaintiff, Penobscot Community Health Center ("Plaintiff," or "PCHC"), by and through its undersigned counsel, asserts this Complaint against Defendant, Community Care Partnership, LLC of Maine ("Defendant" or "CCPM") (jointly, the "Parties") and alleges as follows:

**INTRODUCTION**

This case is about the wrongful retention of over $4 million owed to a non-profit community health center. These critical dollars are being retained by an administrative entity that has neither the legal right nor any good reason to hold onto the funds, which will result in the money not being deployed to support access to critical primary care services in Penobscot, Somerset and Waldo counties.

Plaintiff, Penobscot Community Health Center, Inc., a federally qualified health center, operates 13 clinical locations in Penobscot, Waldo, and Somerset Counties. PCHC's services are critical to meeting the health needs of vulnerable populations and all people in the regions it

1

25388058.1

serves. PCHC provides primary, dental and mental health care, pharmacy services, pediatric and geriatric care, physical therapy, social work, case management, chronic disease management (including management of the HIV outbreak currently pending in Penobscot County), audiology, substance use disorder treatment, and many other specialized services to rural and medically underserved populations. PCHC serves approximately 55,000 patients in the region, 70 percent of whom are lower-income persons and seniors. While PCHC was a founder of Defendant Community Care Partnership of Maine, LLC, (an accountable care organization that provides administrative services to help health centers and hospitals work together), PCHC decided to withdraw from CCPM in early 2025 in favor of joining a different accountable care organization with a national presence to better meet its patients' evolving needs.

Under CCPM's operating agreement, as a withdrawing member PCHC is entitled to the return of the balance in its capital account held by CCPM. However, instead of returning the funds in PCHC's capital account, CCPM tried to manipulate PCHC into agreeing to amend the operating agreement to eliminate that entitlement by misleading PCHC about what the proposed amendment would do. Fortunately, PCHC figured this out and therefore declined to sign the amendment to the operating agreement. However, CCPM pushed forward regardless and now takes the legally incorrect position that an amendment that was not properly approved in writing, is now in effect and binding on PCHC, such that it permits CCPM to deprive PCHC of over $4 million that lawfully belongs to PCHC. On this basis, CCPM has refused to return the funds to PCHC, causing unnecessary and entirely avoidable harm to PCHC. Instead of supporting direct patient care, therefore, these millions of dollars being unlawfully retained by CCPM are being used to support administrative functions rather than PCHC's direct patient care services, which,

2

25388058.1

in turn, deprives Maine people of vital healthcare services at a time of great fragility in the healthcare system.

## PARTIES

1. Plaintiff PCHC is a Maine non-profit corporation and federally qualified health center (FQHC) with its headquarters at 103 Maine Avenue, Bangor, Maine 04401.

2. Defendant CCPM is a Maine Limited Liability Company, operating as an Accountable Care Organization ("ACO") with its headquarters at 106 Congress Street, Bangor, Maine 04401.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 4 M.R.S.§ 105 and the Court's general and plenary jurisdiction under applicable law.

4. This Court has personal jurisdiction over the parties in the action pursuant to 14 M.R.S.§ 704-A.

5. This Court also has proper jurisdiction over the parties and subject matter of this action because the Parties are Maine corporations headquartered in Penobscot County, Maine; and because a substantial part of the events giving rise Plaintiff's claims occurred in Penobscot County, Maine.

## FACTUAL ALLEGATIONS

### PCHC's Role in Maine's Healthcare System

6. As an FQHC, PCHC's mission is to offer comprehensive, integrated primary health care services to all, regardless of individual circumstances or ability to pay.

7. PCHC is the largest of Maine's twenty federally qualified health centers. It serves roughly 55,000 people, providing over 230,000 patient visits annually.

8. PCHC operates in many of Maine's most rural and underserved communities.

3

9.      As an FQHC, PCHC must utilize its program income, i.e., all revenue generated through its operations, along with funds awarded by the federal government under Section 330 of the Public Health Service Act (42 U.S.C. § 254b) to further its federally-mandated scope of project.

10.     The scope of project ("Scope of Project") defines the activities that the total approved Section 330 grant-related project budget supports. Specifically, the Scope of Project defines the approved service sites, services, providers, service area(s) and target population(s) which are supported (wholly or in part) under the total section 330 grant-related project budget.

11.     PCHC's target population is comprised of its patients and any person residing within its service catchment areas who utilizes PCHC services at approved, in scope locations. All program income must be used to benefit PCHC's target population receiving services at in scope locations and cannot be diverted to support activities that are outside PCHC's Scope of Project.

12.     Pursuant to Section 330's implementing regulations, grant funds "may be expended solely for carrying out the approved project in accordance with section 330 of the Act, the applicable regulations of this part, the terms and conditions of the award, and the applicable cost principles prescribed in 45 CFR part 75, subpart E."  42 C.F.R. § 51c.107(a).

**Accountable Care Organizations ("ACO")**

13.     The Centers for Medicare & Medicaid Services ("CMS") defines Accountable Care as "[a] person-centered care team [that] takes responsibility for improving quality of care, care coordination and health outcomes for a defined group of individuals, to reduce care fragmentation and avoid unnecessary costs for individuals and the health system."

4

14.    CMS defines an Accountable Care Organization as a "[g]roup of doctors, hospitals, and other health care professionals that work together to give patients high-quality, coordinated service and health care, improve health outcomes, and manage costs."

15.    As described by CMS, when ACOs provide "higher quality, coordinated care that improves patient health outcomes and reduces Medicare spending, they may be eligible to share in a portion of those savings. Conversely, ACOs could pay a penalty if they provide fragmented care that increases Medicare costs."

16.    ACOs can invest any financial rewards they receive into more patient care services and supports and/or they can share a portion with health providers participating in the ACO.

**PCHC founds Patient First Partnership, LLC**

17.    PCHC, in an effort to increase the quality and availability of care available to the people of Maine, engaged in the process of forming an ACO.

18.    On or about July 15, 2013, PCHC formed a limited liability company, Patients First Partners, LLC. On July 24, 2013, the Company's name was changed to Patient First Partnership, LLC, ("Patient First Partnership"), the purpose of which was to engage in the Medicare ACO program as well as other value-based contracts. PCHC was the sole member of Patient First Partnership and provided the entirety of the funding and staffing for its formation.

19.    Upon information and belief, the stated purpose of Patient First Partnership, was to participate (a) in the Medicare Shared Savings Program described in § 3022 of the Patient Protection and Affordable Care Act, and the regulations promulgated thereunder, and (b) in cost savings arrangements with other government programs, including MaineCare,

25388058.1

commercial insurers and other payors. The Company was empowered to, among other things, develop a network of healthcare providers for (i) the delivery of health care services according to applicable rules, regulations and contractual obligations for the purpose of improving the quality of health care and the patient care experience, improving the general health of the community population served by the Member, and reducing per capita health care costs; and (ii) the operation of an Accountable Care Organization ("ACO") pursuant to the Medicare Shared Savings Program to promote evidence-based medicine and patient engagement, report on quality and cost measures, and coordinate care pursuant to 42 C.F.R. Part 425.

### Creation of Community Care Partnership of Maine, LLC

20.    Due to PCHC's considerable financial and human capital contributions to the ACO infrastructure, including founding documents, key policies, governance and compliance structure of the ACO were established. Unsurprisingly, and as PCHC hoped, other non-profit healthcare providers in Maine seeking a different type of ACO governance structure and approach sought the opportunity to join Patient First Partnership.

21.    On or about May 29, 2014, the company's name was changed from Patient First Partnership, LLC, to Community Care Partnership of Maine, LLC.

22.    On or about May 21, 2015, numerous new members were admitted to CCPM, and an Amended and Restated Limited Liability Company Agreement of Community Care Partnership of Maine, LLC (the "Agreement") was executed. A true and accurate copy of the Agreement is attached hereto as **Exhibit A.**[1]

---

[1] PCHC notes that, upon information and belief, the Agreement was amended ten times. Because the substance of the provisions relevant to this dispute are unchanged, PCHC cites to the original Agreement but notes that the provisions may be found under different section numbers in the Tenth Amendment.

6

23.    At the time the Agreement was executed in 2015, ten entities (including PCHC) were admitted as Members.

### The Terms of the Agreement: Membership and Dissociation.

24.    Section 1.03 outlines the Purpose and Authority of CCPM as follows: "(a) (i) participate in cost savings and other arrangements with government programs, commercial insurers and other payors, (ii) develop a network of health care providers for the delivery of health care services according to applicable rules, regulations and contractual obligations for the purpose of improving the quality and efficiency of health care and the patient care experience; (iii) promote evidence-based medicine, patient engagement, reporting on quality and cost, care coordination and distribution of shared savings; and (b) to engage in any and all activities as may be necessary, incidental or convenient to carry out the purposes of the Company as described in Section 1.03(a), provided the Company may not take any action if that action, in the reasonable judgment of a Member, jeopardizes that Member's tax-exempt status and that Member objects to such action in a written statement to the Board of Managers." **Exhibit A**, p. 2.

25.    Section 2.09 provides that the Members would meet on an annual basis, in the month of January.

26.    Section 2.11(e) outlines actions that must be approved by a Unanimous Vote of the Members: "(i) A vote to dissolve the Company under Section 10.01(a)(i); and (ii) A vote to Amend this Agreement under Section 12.03." **Exhibit A**, p. 6-7.

27.    Section 12.03 states that "[t]his Agreement may be modified or amended only in a writing and only with the unanimous consent of the Members." **Exhibit A**, p. 23.

25388058.1

28.    Section 2.06 of the Agreement describes the process for Dissociation of a Member. It defines dissociation as follows: "A Person who withdraws as a Member, or who is expelled as a Member, is 'dissociated' as a Member for purposes of the Act." **Exhibit A**, p. 4.

29.    The Agreement provides for both involuntary and voluntary dissociation. As to voluntary dissociation, Section 2.06(d) states that "[a] Person may withdraw voluntarily as a Member by delivering written notice of that withdrawal (a 'Withdrawal Notice') to the Board no later than ninety (90) days before the effective date of that withdrawal. The effective date of a Person's withdrawal as a Member is the later of (i) the last day of the calendar year during which that Person's Withdrawal Notice is delivered to the Board, or (ii) the first day that the Contract Year Condition is satisfied. The Contract Year Condition is satisfied if and when that Person withdraws from each and every Contract as to which it is a participant, provided that each such withdrawal takes effect as of the last day of a 'contract year' of the applicable Contract (as to such Contract, such year is the "Contract Year")." **Exhibit A**, p. 5.

30.    Section 2.06(f) is titled Redemptive Distributions and states that "[u]pon a Person's dissociation as a member, such Person shall be redeemed of Its Interest as follows: (i) If that Member is expelled under Section 2.06(b), or Section 2.06(c) a redemptive distribution of One Dollar ($1.00); and (ii) Otherwise, for that Person's Capital Account balance of that Member as determined on the effective date of withdrawal. The Company shall have up to one hundred eight (180) days from the effective date of the withdrawal to pay the redemptive distribution to the withdrawing Member." **Exhibit A**, p. 5-6.

31.    Section 11.03(d) of the Agreement states that "Capital Account" means, " with respect to any Member, the Capital Account maintained for such Member in accordance with

the provisions of Treasury Regulations Section 1.704- 1(b)(2)(iv), provided that, in the event the Board shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or any Members), in order to comply with such Regulations, the Board shall cause such modification to be made, provided that it is not likely to have a material effect on the amounts distributed to any Person pursuant to Section 10.02 hereof upon the dissolution of the Company." *See* **Exhibit A**, p. 21.

### The Terms of The Agreement: Capital Contributions

32.    Article III, Sections 3.01 to 3.09 outline the Members' obligation to fund CCPM. Under Section 3.02(a), each Member was required to make an initial Capital Contribution in "an amount equal to the total capital needed by the Company as determined by the Board in accordance with the Original Annual Budget multiplied by that Member's Percentage Interest." A Member's "Percentage Interest" as of a given time is the quotient of that Member's Attributable Lives as of that time divided by the total Attributable Lives of all Members at that time. **Exhibit A**, p. 7.

33.    Section 3.02(b)(i) defines Attributable Lives of a Member as "the number of individual covered lives for which that Member and any other corporate affiliate of that Member is responsible under Contracts at that time." **Exhibit A**, p. 7.

34.    Schedule A of the Agreement provides that PCHC accounted for forty-two (42) percent of CCPM's 52,227 Attributable Lives at that time.

9

35.    Section 3.02(b)(ii) defines a Capital Contribution as "a contribution of money or property by a Member to the Company in exchange for (or to increase) that Member's 'transferable interest' (as defined in the Act, an 'Interest')." **Exhibit A**, p. 8.

36.    Despite being an existing Member, at the time the Agreement was executed, PCHC agreed to provide an additional Capital Contribution, which is memorialized in Section 3.02(c). **Exhibit A**, p. 8.

37.    Section 3.06 is titled Return of Capital Contributions and states that "Except as otherwise provided in this Agreement, each Member shall look solely to the assets of the Company for the return of his or her Capital Contribution and shall have no right or power to demand or receive property other than cash from the Company. Except as may be provided in this Agreement, no Member shall have priority over any other Member as to the return of such Member's Capital Contribution, distributions, or allocations." **Exhibit A**, p. 9.

**The Terms of the Agreement: Members and Managers**

38.    Article V of the Agreement establishes CCPM's Board of Managers. Section 5.01(a) provides that "a board of directors of the Company (the 'Board' or the 'Board of Managers') shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company." **Exhibit A,** p. 10.

39.    Section 5.01(c) provides that "The Board of Managers and, to the extent delegated by the Board of Managers, the Company's officers shall have the exclusive power and authority to bind the Company. The Board of Managers may designate such persons as it shall from time to time select to serve as officers of the Company, with such duties, responsibilities and powers as the Board of Managers shall determine." **Exhibit A**, p. 10.

25388058.1

40.    As provided in Section 5.04(a), the number of managers "shall be the same as the number of Members" and each Member "shall appoint one (1) individual to serve as its representative Manager." **Exhibit A**, p. 11.

### **CCPM's Growth and Amendments to the Agreement**

41.    Due to PCHC's commitment to CCPM, which included, amongst other things, large annual capital contributions and the lending of employees to CCPM which often made up the majority of CCPM's staff, CCPM continuously expanded.

42.    In addition, PCHC funded legal costs associated with CCPM's formation, developed the statement of shared values and other founding corporate documents, drafted the first compliance plan and standards of conduct, and otherwise lent the expertise of its leadership team, including its CEO, General Counsel, Chief Information Officer, Chief Medical Officer and Chief Quality Officer, in support of the ACO start-up and ongoing operations throughout CCPM's start-up phase.

43.    Because of these efforts and the collective work of CCPM members, more and more non-profit healthcare providers sought to join CCPM.

44.    As such, from time to time, the Members agreed to amend the Agreement, primarily for the purpose of admitting new members.

45.    At no time did the Members vote to modify the terms of the Agreement as to capital contributions, dissociation, or the governing structure of CCPM.

46.    Upon information or belief, since approximately 2018 or 2019, CCPM followed the same procedure when amending the Agreement.

25388058.1

47.    First, the Board of Managers would review the proposed amendment. If the proposed amendment was satisfactory to the Board of Managers, it would vote to approve the amendment and send it to the Members for review and approval.

48.    Subsequently, each Member would review the proposed amendment and then execute it in writing, as required by Section 12.03. **Exhibit A**, p. 23.

49.    Upon information and belief, at no point in this history of CCPM was the Agreement modified without the written execution of each and every Member.

50.    Upon information and belief, at no point in the history of CCPM did the Board of Managers act in a manner consistent with it having the power to bind the Members without their express consent.

51.    By way of example, on June 20, 2023, CCPM's Board of Manager Meeting Minutes reflect that the *Board of Managers* voted to amend the Agreement.

52.    At that meeting, the Minutes indicated that the Board was told that "the new LLC will be sent in the follow up email" after the meeting and "we ask that all *organizations* please review, sign, and return by June 30th." (emphasis added).

**PCHC Raises Concerns Regarding Its Relationship with CCPM**

53.    Although CCPM, with PCHC as its largest member, continued to grow, the leadership team at PCHC began to develop concerns with the leadership and direction of CCPM.

54.    In or around, February 2024, Lori Dwyer, the President and CEO of PCHC ("Ms. Dwyer"), met with Sandy Nesin, CEO of CCPM ("Ms. Nesin").

55.    Upon information and belief, at that meeting, Ms. Dwyer expressed PCHC's concerns, one of which was that capital contributions were too high, noting that PCHC was

12

25388058.1

projected to provide $1 million of CCPM's $2.5 million operating budget in 2024, despite PCHC informing CCPM's leadership that CCPM had not adequately scaled its members support and services in a manner that allowed it to continue to adequately support PCHC.

56.    Upon information and belief, Ms. Dwyer also communicated PCHC's concerns that despite being CCPM's largest member, PCHC's opportunity to meaningfully participate in CCPM's strategic decision making had significantly contracted over the past two or three years. Notably, at that time, no PCHC employees held CCPM leadership or board leadership positions.

57.    Upon information and belief, Ms. Dwyer also communicated PCHC's concerns with CCPM's culture, the limited health center operations experience among CCPM staff and the lack of a partner or specialist at CCPM dedicated to PCHC who had experience implementing population health initiatives in large primary care settings, as opposed to in small health centers and hospital-based settings.

58.    Finally, upon information and belief, Ms. Dwyer noted that CCPM's employment model was not sustainable, as PCHC was the employer of record for CCPM staff, leasing those employees back to CCPM but not being reimbursed the full costs associated with employment.

59.    Ms. Dwyer shared these concerns with Ms. Nesin so they could find solutions that would enable PCHC to continue to offer its critical health services to the people of Maine and remain in the ACO that it founded. At the same time, Ms. Dwyer made clear to Ms. Nesin that PCHC would have to depart CCPM if material changes were not made.

25388058.1

60.    In or around May 22, 2024, Ms. Nesin met with PCHC's Board of Directors, providing CCPM the opportunity to discuss with PCHC's Board of Directors why CCPM could continue to be the best ACO for PCHC.

61.    Ms. Nesin did not adequately address Ms. Dwyer or the Board of Director's concerns at the in or around the May 22, 2024 meeting; and Ms. Nesin failed to persuade PCHC that remaining in CCPM was in PCHC's best interests.

62.    Unfortunately, CCPM's leadership and Ms. Nesin did not resolve the material concerns raised by Ms. Dwyer on behalf of PCHC, offering no shift in the contribution structure, declining to shift governance structures on the board or offer leadership opportunities to PCHC staff, and not materially increasing its support or expertise to augment PCHC's capacity and support its needs.

**CCPM Proposes to Amend the Agreement**

63.    On March 19, 2024, CCPM Board of Managers held a regularly scheduled monthly meeting.

64.    Ms. Dwyer was present at the meeting, in her capacity as a *Manager* of CCPM.

65.    At the meeting, Mary Butler-Fleming, CCPM's Chief Operating Officer, presented on the topic of "LLC Agreement Updates & Recommendations from Legal Counsel." According to the meeting minutes, the proposed Eleventh Amended and Restated Limited Liability Company Agreement of Maine Community Care Partnership of Maine, LLC ("the Eleventh Amendment") was contained in a packet of documents provided to the Board.

66.    Upon information and belief, the packet of documents was provided to the Board shortly before or at the beginning of the meeting.

14

25388058.1

67.    The meeting minutes reflect that the Board of Managers were told "most of" the changes were "regarding finance and the process for dues to reflect current processes."

68.    Upon information and belief, CCPM's staff and officers failed to inform the Board of Managers that the functional impact of the revisions to the Agreement was the forfeiture of Members' Capital Accounts.

69.    CCPM's leadership called for a vote of the Board of Managers, but without allowing Managers to first carefully read and understand the impact of voting "yes" to the proposed Eleventh Amendment.

70.    During the Board of Managers meetings, the Board, including Ms. Dwyer, voted orally to approve the proposed Eleventh Amendment, understanding that, per the Board's usual course, all Members would have an opportunity to review, seek legal counsel, ask questions and decide whether to accept or reject the proposed Eleventh Amendment.

71.    The result of the vote was that the proposed Eleventh Amendment was sent to the Members for review, consideration, and if approved, signature.

72.    Upon information and belief, members of CCPM's leadership team, including Ms. Nesin, intentionally, willfully, and/or negligently mislead the Board of Managers by not informing them that voting "yes" to the proposed changes would mean that each member organization would sacrifice their capital contributions if they departed CCPM.

73.    Upon information and belief, CCPM's leadership team intended to mislead and/or negligently misled—the Board of Managers and, in turn, the Members, into executing the proposed Eleventh Amendment without informing them that each Member was sacrificing their Capital Account if they departed the organization.

15

74.    Upon information and belief, CCPM's leadership team knew the outcome of the proposed Eleventh Amendment was to prevent Members from retaining their Capital Account on dissociation and as such to punish members who dissociated.

75.    Upon information and belief, the deceptive, intentional and/or negligent actions of CCPM's leadership team regarding the proposed Eleventh Amendment were targeted to negatively impact PCHC who they knew was going to depart the ACO as a result of CCPM's leadership declining to negotiate solutions in good faith to resolve the material concerns raised by PCHC.

### PCHC Disassociates from CCPM, but CCPM Refuses to Return PCHC's Capital Account

76.    After the Board of Managers meeting, Ms. Dwyer provided the proposed Eleventh Amendment to PCHC's leadership team and legal counsel.

77.    Ms. Dwyer was alarmed and surprised  to learn that the impact of the proposed Eleventh Amendment was the forfeiture of PCHC's Capital Account in the event of a departure from CCPM.

78.    Not surprisingly, PCHC's Board and leadership team concluded that PCHC could not agree to the terms of the proposed Eleventh Amendment.

79.    As such, PCHC declined to and never signed the proposed Eleventh Amendment.

80.    Shortly after the March 19, 2024, CCPM Board of Managers meeting, PCHC began the process of dissociating from CCPM.

81.    In or around June, 2024, representatives from CCPM, including Ms. Nesin, met with representatives from PCHC, including Ms. Dwyer, to discuss PCHC's dissociation and related offboarding tasks.

82.    The representatives agreed to work together and with legal counsel to prepare a termination agreement.

83.    On September 27, 2024, PCHC provided formal written notice to CCPM that it would not be approving and signing the proposed Eleventh Amendment.

84.    However, despite the clear and unambiguous language of the Agreement, CCPM refused to return the funds in PCHC's Capital Account.

85.    Instead, CCPM has shockingly taken the position that it is entitled to retain the entirety of PCHC's Capital Account, including, upon information and belief, without limitation, PCHC's capital contributions and PCHC's share of funds from the Medicaid Shared Savings Program.

86.    CCPM has also refused to negotiate in good faith or enter into a mutually agreeable termination agreement, despite their leadership team's previous agreement to do so.

87.    On December 31, 2024, PCHC, in compliance with the terms of the Agreement, provided formal written notice of its dissociation from CCPM, effective March 31, 2025.

88.    The Agreement contains a 180-day contractual period running from the effective date of PCHC's dissociation in which CCPM must make the redemptive distribution of PCHC's Capital Account.

89.    This 180-day contractual period expired on September 27, 2025.

90.    The expiration came and went without CCPM returning the balance of PCHC's Capital Account, or any funds to PCHC.

91.    CCPM's refusal to provide PCHC the balance of its Capital Account is a knowing and willful violation of the clear and unambiguous terms of the Agreement.

25388058.1

92. CCPM's refusal to provide PCHC the balance of its Capital Account or any other funds has significantly and negatively impacted PCHC's ability to provide critical healthcare services to tens-of-thousands of Maine residents.

93. In contrast, CCPM provides no direct healthcare services to any person.

94. Upon information and belief, based upon CCPM's K-1 forms and an independent opinion offered by CCPM's accounting firm, the balance of PCHC's Capital Account at the end of 2024 was **$4,183,833**.

95. Upon information and belief, this amount has continued to materially increase since that time.

96. CCPM has not only wrongfully withheld funds from PCHC, but has further retaliated against PCHC since PCHC's disassociation.

97. For example, CCPM terminated, without cause and in bad faith, a contract with PCHC related to PCHC's provision of pharmacist services, negatively impacting PCHC and the specific PCHC employee who provided services under that contract.

### COUNT I – DECLARATORY JUDGMENT 14 M.R.S. § 5951, *et seq.*

98. PCHC repeats and realleges the allegations set forth above as if fully set forth herein.

99. PCHC brings this action pursuant to 14 M.R.S.A. § 5951, *et seq.*, seeking a declaratory judgment stating that (1) CCPM failed to successfully amend the essential terms of the Agreement with the proposed Eleventh Amendment; and that the essential terms of the Agreement endure; and (2) a determination that the book value of the "Capital Account balance" as it appears in Paragraph 2.06(f)(ii) of the Agreement is properly assessed as a Member's Schedule K-1.

25388058.1

100.  Under 14 M.R.S.A. § 5953, this Court has the power to declare rights, status and other legal relations such as the Parties' rights and obligations under contract. The declaration may be either affirmative or negative in form and effect.

101.  The Court must enter a declaratory judgment if the judgment would terminate the uncertainty or controversy giving rise to the action which in this case relates to: (1) CCPM's ineffective amendment of the essential terms of the Agreement through the proposed Eleventh Amendment; and (2) the intended assessment of value of the Capital Account balance appearing in Section 2.06(f)(ii) of the Agreement.

102.  Under Section 2.06(f)(ii) of the Agreement, at the time of dissociation PCHC was entitled to be "redeemed of its interests" for the value of its "Capital Account balance" withing one hundred eighty (180) days from the date of its effective dissociation. *See* **Exhibit A**, p 2.

103.  PCHC successfully dissociated from the LLC in compliance with the terms of the Agreement effective March 31, 2025, and was entitled to the balance of its Capital Account by September 27, 2025.

104.  Upon information and belief, Defendant improperly withheld PCHC's redemptive distributions on the incorrect grounds that the proposed Eleventh Amendment superseded the essential terms of the Agreement.

105.  The terms of the proposed Eleventh Amendment are not effective as to PCHC and do not supersede the Agreement because the Eleventh Amendment was not approved by all CCPM members in writing, following a Board of Managers meeting as required by the Agreement and established by the parties' prior course of dealing.

25388058.1

106. In the unlikely event that the Court were to find the proposed Eleventh Amendment effective – which it should not – the Eleventh Amendment must be voidable because CCPM sought to add the amendments with the use of deceptive, misleading, and fraudulent tactics.

107. Upon information and belief, Defendant also disputes the meaning of "Capital Account Balance" as it appears in the Agreement with respect to the determining the amount of money PCHC would be entitled to upon dissociation.

108. As a result, an actual controversy exists concerning:

i.      Whether CCPM effectively amended the terms of the Agreement.

ii.     The intended book value of the "Capital Account Balance" as it appears in Paragraph 2.06(f)(ii) of the Agreement and whether it may be is properly assessed as the value reported on the Member's Schedule K-1.

109. Plaintiff is entitled to a judicial declaration resolving these disputed rights and obligations to prevent further harm and to clarify the legal responsibilities of the Defendants.

110. A declaration will terminate any controversy as set forth herein.

**COUNT II – BREACH OF CONTRACT**

111. PCHC repeats and realleges the allegations set forth above as if fully set forth herein.

112. PCHC's withdrawal from CCPM was a voluntary dissociation under Section 2.06(d) of the Agreement.

113. Section 2.06(f)(ii) of the Agreement confers an automatic entitlement to "redemptive distributions" of the "Capital Account balance of that Member as determined on the effective date of withdrawal." *See* **Exhibit A**.

25388058.1

114. Upon effective withdrawal, CCPM is required to pay the withdrawing member's redemptive distributions within 180 days of the effective withdrawal date.

115. PCHC effectively withdrew from CCPM on March 31, 2025.

116. CCPM did not deliver a redemptive distribution to PCHC in the amount of its Capital Account balance as of March 31, 2025, by September 27, 2025.

117. CCPM has not paid PCHC any amount since its effective date of withdrawal despite repeated inquiries to CCPM and multiple opportunities to cure.

118. PCHC has suffered and continues to suffer damages, including, without limitation, the loss of the balance of its Capital Account that it is entitled to receive pursuant to the Agreement.

119. Under the Maine Limited Liability Act, "[i]f a member or transferee becomes entitled to receive a distribution, the member or transferee has the status of, and is entitled to all remedies available to, a creditor of the limited liability company with respect to the distribution." 31 M.R.S. § 1554(4).

120. PCHC was entitled to receive its "redemptive distribution" after proper dissociation and did not.

121. Accordingly, PCHC is now a creditor of CCPM with respect to its Capital Account distribution and is entitled to all of the rights and remedies afforded to a creditor to recover this distribution.

## COUNT III – FRAUDULENT MISREPRESENTATION

122. PCHC repeats and realleges the allegations set forth above as if fully set forth herein.

21

25388058.1

123. In the unlikely event that the Court finds that the proposed Eleventh Amendment is effective despite CCPM's abject non-compliance with amendment procedure, PCHC is entitled to damages for CCPM's fraudulent misrepresentations in the inducement of said amendment.

124. In Maine, a defendant will be liable for fraudulent misrepresentation when it is shown that the defendant made (1) a false representation, (2) of a material fact, (3) with knowledge of its falsity or in reckless disregard of whether it is true or false, (4) for the purpose of inducing a plaintiff to act in reliance upon it, and (5) a plaintiff justifiably relied upon the representation as true and acted upon it. *Maine Eye Care Assocs. P.A. v. Gorman*, 2006 ME 15, ¶ 19, 890 A.2d 707.

125. When a "fraud claim is based on silence as to a material fact," as is the case here, "the plaintiff must [also allege] . . . a specific relationship imposing on the defendant an affirmative duty to disclose." *Alrig USA Acquisitions v. MBD Realty LLC*, 2025 ME 11, ¶ 17, 331 A.3d 372.

126. In or around February, 2024, Ms. Dwyer met with Ms. Nesin to discuss PCHC's various concerns about its continued role as a member of CCPM and in particular, its concerns about PCHC's exceedingly high capital contributions to CCPM's operating budget.

127. Prior to the February discussion, in approximately December of 2023, Ms. Dwyer had shared with Ms. Nesin that PCHC was researching other ACO models.

128. Upon information and belief, Ms. Nesin interpreted the February discussion as an indicator that PCHC was seriously considering leaving the ACO.

25388058.1

129.  Upon information and belief, Ms. Nesin and other CCPM officers anticipated PCHC's disassociation and wanted to avoid paying PCHC its redemptive distribution because the sum in PCHC's Capital Account was significant.

130.  On March 19, 2024, just weeks after CCPM learned (directly or indirectly) that PCHC may have been contemplating dissociation, its leadership team presented the proposed Eleventh Amendment to the Board of Managers.

131.  The meeting minutes from the March 19, 2024 meeting reflect that a copy of the proposed Eleventh Amendment was contained in a packet of documents provided to the Board of Managers.

132.  Ms. Dwyer attended the March 19, 2024 Board of Managers meeting solely in her capacity as a Manager of the Board of Managers of CCPM.

133.  The meeting minutes reflect that the Board members were told "most of" the changes in the Eleventh Amendment were "regarding finance and the process for dues to reflect current processes."

134.  Among other things, the CCPM Board of Manager minutes for the March 19, 2024 meeting memorialize that the following topics were discussed relevant to the Eleventh Amendment:

i.  That the Board of Managers was told the proposed Eleventh Amendment sought to "memorialize" alternative payment options for member dues structures.

ii.  That the Board of Managers was told that CCPM members would be required to enter into a withdrawal agreement if they were to leave the organization under the Eleventh Amendment.

23

25388058.1

iii. That the Board of Managers was told that it would have the authority to make decisions regarding dues when a member defaults on payment.

iv. That the Board of Managers was told that an additional option was created for member contract participation requiring that members participate in all contracts that they are deemed qualified to participate in.

v. That the Board of Managers was told that the Eleventh Amendment would remove the statement that the company held separate cash accounts for each contract as this was not CCPM's practice.

135.   Although the proposed Eleventh Amendment was discussed at the March 19, 2024 meeting, there was no reference in the meeting minutes or at the meeting itself to the elimination of a key term of the Agreement or discussion concerning the impact of eliminating this key term: the entitlement of members to their redemptive distribution of their Capital Accounts upon voluntary dissociation.

136.   Upon information and belief, the Board of Managers were not informed that the functional impact of the revisions to the Agreement was the forfeiture of their Capital Accounts.

137.   The functional impact of the revisions to the Agreement is a material fact that CCPM intentionally withheld from the Board of Managers, Members, and PCHC.

138.   Considering CCPM's motivation to avoid paying PCHC the balance of its substantial Capital Account conspicuously omitting the impact constitutes a fraudulent misrepresentation of a material fact.

139.   CCPM owed a fiduciary duty to its Board of Managers and individually to all of its members of "good faith, diligence, [and] care" to honestly disclose how the proposed

24

Eleventh Amendment would affect each Member's financial interests. *See* 31 M.R.S. § 1559(1).

140. CCPM staff and officers intentionally sought to amend the terms of the Agreement to eliminate PCHC's prospective entitlement to the redemptive distribution of its Capital Account and intentionally withheld the effect of the proposed Eleventh Amendment from both Managers and Members, including PCHC, prior to and at the March 19, 2024, meeting to induce PCHC to acquiesce to an agreement which CCPM knew or should have known would and has negatively impacted its interests.

141. Ms. Dwyer relied on the representations made by Ms. Nesin and during the March 19, 2024 meeting Ms. Dwyer relied on the representations of CCPM's staff and officers which both left her with the understanding that the proposed Eleventh Amendment would not impact PCHC's financial rights upon dissociation when making her decision to orally vote in her capacity as Manager.

142. PCHC later discovered, after reviewing the content of the proposed Eleventh Amendment in detail and with legal counsel, that it would have the effect of eliminating its automatic entitlement to its redemptive distribution, a substantial and material negative impact to PCHC.

143. Ms. Dwyer informed CCPM that she would not sign the proposed Eleventh Amendment on behalf of PCHC after learning of the true effect that the proposed Eleventh Amendment would have on PCHC.

144. Upon information and belief, when PCHC formally dissociated, CCPM knowingly and falsely relied on the proposed Eleventh Amendment to withhold PCHC's

redemptive distribution of its Capital Account that it was entitled to under the terms of the original LLC Agreement.

145. PCHC has been damaged by CCPM's fraudulent misrepresentation, fraudulent omission, and/or fraudulent implementation of the proposed Eleventh Amendment in its refusal to provide PCHC's redemptive distribution of its Capital Account.

## COUNT IV – FRAUD IN THE INDUCEMENT

146. PCHC repeats and realleges the allegations set forth above as if fully set forth herein, including, without limitation, the preceding paragraphs 126 through 145 set forth above.

147. In the unlikely event that the Court finds that the proposed Eleventh Amendment to be effective despite CCPM's abject non-compliance with the amendment procedure, the Agreement must be voidable due to CCPM's fraud in the inducement of this amendment.

148. "Fraud is an affirmative defense to a contract" and when successfully raised, a contract is rendered voidable. *Me. Family Federal Credit Union v. Sun Life Assur. Co. of Canada*, 1999 ME 43, ¶ 38, 727 A.2d 335 (citing M.R. Civ. P. 8(c)).

149. A contract will be voidable due to fraud when it is shown that (1) the defendant failed to disclose a material fact, "(2) when a legal or equitable duty to disclose exists, (3) with the intention of inducing another to act or refrain from acting in reliance on the non-disclosure, and (4) the plaintiff in fact relied upon the non-disclosure to the plaintiff's detriment." *Picher v. Roman Catholic Bishop of Portland*, 2013 ME 99, ¶ 3, 82 A.3d 101.

150. Because the Eleventh Amendment is voidable, the terms of the Agreement apply, and PCHC is entitled to the balance of its Capital Account.

26

25388058.1

## COUNT V – NEGLIGENT MISREPRESENTATION

151.  PCHC repeats and realleges the allegations set forth above as if fully set forth herein.

152.  In the unlikely event that the Court finds that the proposed Eleventh Amendment to be effective despite CCPM's abject non-compliance with the amendment procedure, PCHC is entitled to damages for CCPM's negligent misrepresentations in the inducement of the agreement.

153.  A defendant will be liable for negligent misrepresentation when, (1) in a transaction in which the defendant had a pecuniary interest, (2) the defendant provided false information to the plaintiff in connection with the transaction, (3) without exercising reasonable care or competence, and (4) plaintiff justifiably relied on that false information in that transaction. *Binette v. Dyer Library Ass'n.,* 688 A.2d 898, 903 (Me. 1996).

154.  CCPM had a pecuniary interest in modifying the core terms of the Agreement to avoid paying PCHC its redemptive distribution of its Capital Account when it knew that PCHC intended to dissociate.

155.  CCPM conveniently omitted any reference to the fact that Members would forfeit their entitlement to their redemptive distribution upon dissociation by voting in favor of the Eleventh Amendment though many other elements of the Amendment were addressed at the Board of Managers meeting where members were expected to vote orally. *See also* ¶ 134(i)-(iv) *supra*.

156.  It was objectively unreasonable and demonstrated a lack of competence for CCPM to withhold the effect of the proposed Eleventh Amendment.

25388058.1

157.  Ms. Dwyer relied on the representations made by CCPM officers and staff on and before March 19, 2024, believing that the proposed Eleventh Amendment would affect the Agreement as CCPM described.

158.  For this reason, Ms. Dwyer voted in favor of the proposed Eleventh Amendment in her capacity as Manager of CCPM's Board of Managers.

159.  PCHC has been damaged by CCPM's negligent misrepresentations because CCPM has subsequently relied on the proposed Eleventh Amendment to refuse to provide PCHC's redemptive distribution of its Capital Account.

160.  PCHC is entitled to recover the value of its Capital Account which has been wrongfully withheld and any other incidental damages incurred.

**COUNT VI – BREACH OF FIDUCIARY DUTIES**
**31 M.R.S. § 1559(1)(2)**

161.  PCHC repeats and realleges the allegations set forth above as if fully set forth herein.

162.  The Maine Limited Liability Act (the "Act") confers an affirmative duty of "good faith; diligence; care [and] skill" on managing members with respect to other member's interests in the LLC. 31 M.R.S. § 1559(1).

163.  This duty requires members to "discharge their duties . . .in good faith and with a view to the interests of . . . the members." *Id.*

164.  The Act equates the duties and obligation imposed upon managing members also upon "officer and directors" as "individuals having comparable management authority" with respect to the LLC. 31 M.R.S. § 1560(2)(D).

165.  The CCPM staff and officers, breached the fiduciary duties they owed to PCHC by failing to provide sufficient information about the devastating effect of the proposed

28

Eleventh Amendment on PCHC's interests in the LLC before and at the March 19, 2024, Board of Managers meeting.

166. On or before February 7, 2024, CCPM's staff and officers knew that PCHC may and/or was likely to dissociate due to its expressed concerns.

167. Thereafter, CCPM's leadership team knew and were involved in proposing an amendment to the terms of the Agreement in order to eliminate PCHC's entitlement to the redemptive distribution of its Capital Account, if PCHC decided to dissociate from CCPM.

168. Although the proposed Eleventh Amendment materially negatively impacted PCHC's—and all other Members'—financial  interests, CCPM officers and staff, intentionally and deceptively withheld this information from PCHC, Members, and the CCPM Board of Managers before and at the March 19, 2024, meeting in order to induce Ms. Dwyer and other Members to verbally acquiesce to the amended terms at the March 19th meeting and, to attempt to induce Ms. Dwyer to sign the proposed Eleventh Amendment purportedly on behalf of PCHC.

169. As such, CCPM's staff, and officers, failed to discharge the duty of good faith owed to Members of CCPM, including PCHC.

170. Upon information and belief, CCPM staff, and officers did not hold the reasonable belief that the proposed Eleventh Amendment was in the best interests of Members, including PCHC.

171. The actions of CCPM's staff and officers breached their individual and collective fiduciary duties owed to Members of CCPM.

172. This breach caused PCHC damages in the loss of its entitlement to the value of its Capital Accounts, which it had previously relied on.

25388058.1

## COUNT VII– BREACH OF FIDUCIARY DUTIES
### 42 C.F.R. 425.102(a)(8)

173. PCHC repeats and realleges the allegations set forth above as if fully set forth herein.

174. CCPM is an accountable care organization (ACO) designed participated in the Medicare Share Services Program, governed by 42 C.F.R. 425 *et seq.*

175. By regulation, ACO "governing body members must have a fiduciary duty to the ACO, including a duty of loyalty, and must act consistent with that fiduciary duty." 42 C.F.R. § 425.106(b)(3).

176. CCPM did not act in a manner consistent with its duty of loyalty when it withheld from Managers and Members information about the impact of the proposed Eleventh Amendment, purporting to deprive Members including PCHC from entitlement to the redemptive distribution of Capital Accounts upon voluntary dissociation.

177. Depriving a member organization of its ability to use ACO funds upon withdrawal and transfer to another ACO is directly contrary to a participating member's financial interests.

178. CCPM's subsequent retention of PCHC's redemptive distribution further harms PCHC as a previous member of the ACO because these funds qualify as "program income" under federal grant regulations because the contract earnings were generated by grant-funded activities. 45 C.F.R. § 75.2.

179. PCHC cannot use its "program income" for the required purposes described by federal regulation while it is improperly retained by CCPM.

180. CCPM has breached its fiduciary duties as defined by federal law applicable to ACOs by withholding PCHC's redemptive distribution of program income.

25388058.1

181. PCHC has incurred damage due to this breach in the form of *inter alia* value of its redemptive distribution entitlement and any other incidental damages incurred.

## COUNT VIII – UNJUST ENRICHMENT

182. PCHC repeats and realleges the allegations set forth above as if fully set forth herein.

183. PCHC neither knowingly nor voluntarily agreed to relinquish its right to its Capital Account.

184. As a result of its patient attribution rate, PCHC contributed proportionally the largest share of undistributed payor contract revenue to CCPM's reserves.

185. PCHC paid CCPM membership dues which totaled approximately $1-2 million per year from 2019 to 2024.

186. Both the payer contract revenue and membership dues constitute benefits conferred upon CCPM.

187. CCPM had knowledge of and accepted the benefits conferred by PCHC.

188. CCPM's retention of the Capital Account attributed to PCHC after it withdrew from the organization resulted in a financial windfall to CCPM, while depriving PCHC of health center program income that would otherwise, as required by law, be expended by PCHC in furtherance of its federally-approved scope of project, namely by providing health, dental and related services to the Maine communities it serves regardless of patients' ability to pay.

189. CCPM retains the benefit of PCHC's Capital Account balance, at PCHC's expense, where CCPM will not incur any future risks, operational expenses, or infrastructure costs in support of PCHC and its attributed lives.

31

190. CCPM's disgorgement of the funds at issue has directly negatively impacted PCHC's patients and its ability to improve access to care in the Maine communities PCHC serves.

191. Therefore, PCHC has suffered damages as a result of CCPM's unjust enrichment.

## COUNT IX – CONVERSION

192. PCHC repeats and realleges the allegations set forth above as if fully set forth herein.

193. PCHC had a property interest in its Capital Accounts by virtue of its automatic entitlement to the accounts 180 days after dissociation under the redemptive distribution provision of the operable Agreement.

194. As of September 27, 2024, PCHC had a right to possess its redemptive distribution funds.

195. After that date, PCHC made multiples demands to CCPM for its funds to be turned over which were denied by CCPM.

196. CCPM has converted PCHC's redemptive distribution and is wrongfully retaining it to PCHC's continued detriment.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

A.    An award of damages in an amount to be determined at trial, but in no event less than $4,183,833;

B.    An award of punitive damages in an appropriate amount;

C.    An award of attorney's fees and costs;

D.    An award of pre & post judgment interest and costs; and

32

25388058.1

E.      Such relief as the Court deems equitable and just.

DATED: March 3, 2026

Respectfully submitted.

*/s/ Timothy J. Bryant*

Timothy J. Bryant, Esq., Bar No. 7736
Christoper S. Knight, Esq., Bar No. 10288
Kelsey L. Kenny, Esq., Bar No. 10681
Preti, Flaherty, Beliveau & Pachios LLP
One City Center, P.O. Box 9545
Portland, ME 04112-9546
Tel: (207) 791-3000
tbryant@preti.com
cknight@preti.com
kkenny@preti.com
*Attorneys for Penobscot Community Health Center*

33

25388058.1

Electronically Filed: 3/3/2026 2:22 PM

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**COMMUNITY CARE PARTNERSHIP OF MAINE, LLC**

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of Community Care Partnership of Maine, LLC (the "Company") is made as of May 21, 2015 (the "Effective Date") by and among the Members.

## RECITALS

1.      The Company was formed under the name "Patients First Partners LLC" on July 15, 2013;

2.      The then sole member of the Company, Penobscot Community Health Center, a Maine nonprofit corporation ("PCHC") entered into a limited liability company agreement for the Company on July 12, 2013 (the "Original Agreement");

3.      On July 24, 2013, the Company's name was changed to "Patients First Partnership, LLC";

4.      On May 29, 2014, the Company's name was changed to "Community Care Partnership of Maine, LLC";

5.      PCHC wishes to admit certain Persons as Members of the Company effective as of the Effective Date;

6.      Those Persons wish to be so admitted;

7.      PCHC and those Persons wish to amend and restate the limited liability company agreement of the Company;

NOW, THEREFORE, the Members agree as follows:

## ARTICLE I
## THE COMPANY

**Section 1.01   Existence.** PCHC executed the Original Agreement as of July 12, 2013, authorizing Kathleen G. Healy to file the Company's Certificate of Formation (together with any properly authorized amendments or corrections thereto, the "Certificate"). On July 15, 2013, the Company was formed when the Certificate was filed with the Secretary of State of the State of Maine in accordance with the provisions of the Maine Limited Liability Company Act (31 M.R.S.A. § 1501 et seq.), as amended from time to time (or any corresponding provisions of any successor statute) (the "Act"). The Members hereby agree to enter into this Agreement, intending that, as of the Effective Date, this Agreement (as amended in accordance with the

1

terms hereof) is and shall be the Company's "limited liability company agreement" for purposes of the Act.

**Section 1.02  Name and Office.**  The Company's name is and shall continue to be "Community Care Partnership of Maine, LLC".  The Company's principal office, place of business and mailing address shall be c/o Penobscot Community Health Center, 103 Maine Avenue, Bangor, Maine.

**Section 1.03  Purpose and Authority.**

(a)     The Company's purposes are to (i) participate in cost savings and other arrangements with government programs, commercial insurers and other payors; (ii) develop a network of health care providers for the delivery of health care services according to applicable rules, regulations and contractual obligations for the purpose of improving the quality and efficiency of health care and the patient care experience; (iii) promote evidence-based medicine, patient engagement, reporting on quality and cost, care coordination and distribution of shared savings; and

(b)     to engage in any and all activities as may be necessary, incidental or convenient to carry out the purposes of the Company as described in Section 1.03(a), provided the Company may not take any action if that action, in the reasonable judgment of a Member, jeopardizes that Member's tax-exempt status and that Member objects to such action in a written statement to the Board of Managers (the "Board").

**Section 1.04  Agent for Service of Process.**  The registered agent for service of process on the Company in the State of Maine shall be Kathleen G. Healy, c/o Verrill Dana, LLP, One Portland Square, Portland, Maine 04101, or any successor as appointed by the Board.

## ARTICLE II
## MEMBERSHIP

**Section 2.01  Members.**  The Original Member and any other Person who is properly admitted as a Member remains a Member from the effective date of that admission until that Person resigns, is expelled, or withdraws as a Member.

**Section 2.02  Admission.**

(a)     The following Persons shall be admitted as of the Effective Date upon executing a counterpart of this Agreement and delivering to the Company its Initial Capital Contribution:

       (i)      Katahdin Valley Health Center,

       (ii)     Pines Health Services,

       (iii)    D.F.D. Russell Medical Center, Inc.,

       (iv)    Portland Community Health Center,

2

(v)      Islands Community Medical Service,

(vi)     Sebasticook Family Doctors,

(vii)    York County Community Action Corporation,

(viii)   Millinocket Regional Hospital,

(ix)     Penobscot Valley Hospital, and

(x)      H.A.D. #4, d/b/a Mayo Regional Hospital

(b)      St. Joseph Healthcare Foundation.  St. Joseph Healthcare Foundation shall be admitted as a Member as of the later of (i) the date it makes an Initial Capital Contribution approved by the Board and (ii) the date that it executes a Joinder Agreement in the form set forth on Exhibit 2.02 hereof.

(c)      Additional Members.  Any Person who is not admitted under Section 2.02(a) or (b) may be admitted as a Member if:

(i)      That Person is a Qualified Member, as determined by the Board;

(ii)     That Person satisfies the conditions established by the Board for that Person's admission as a Member;

(iii)    That Person executes a Joinder Agreement in the form set forth on Exhibit 2.02 hereof; and

(iv)     The Members vote or consent to admit that Person by a Super-Majority Vote of Members.

(d)      Substitute Members.  A Person who acquires some or all of an Interest may be admitted under procedures and conditions set forth in Section 9.03.

**Section 2.03   Schedule A.**  Upon the admission of any additional Member, the CEO shall cause Schedule A to be amended to reflect the name, address and Capital Contributions, if any, made by such additional Member.

**Section 2.04   Limited Liability.**  The liability of a Member in his or her capacity as Member shall be limited to the amount of the Capital Contributions of that Member.

**Section 2.05   Member Qualifications.**

(a)      Qualifications. No Person may be a Member unless such Person:

(i)      Owns and operates a health care facility;

(ii)    is exempt from income tax under either (A) Section 501 of the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law) (the "Code") or (B) Code Section 115;

(iii)    maintains professional liability insurance with at least the minimum coverage as established by the Board from time to time, and/or has tort immunity under the Federal Tort Claims Act, as made applicable to federally qualified health centers under Section 224 of the Public Health Service (PHS) Act, as amended by the Federally Supported Health Centers Assistance Act of 1992 and 1995;

(iv)    participates in Medicare and Medicaid; and

(v)    meets such other requirements to which the Members may from time to time agree.

(b)    Restrictions on Admission.  No Person may be admitted as a Member unless such Person qualifies to be a Member under Section 2.05(a) hereof.

(c)    Automatic Dissociation.  If a Member ceases to qualify as a Member under Section 2.05(a) hereof, such Person shall be automatically dissociated as a Member and its transferable interest (as such term is defined under the Act, an "Interest") shall be forfeited and liquidated under the provisions of Section 2.06(c) hereof.

(d)    Special Rules of Conduct.  In the conduct of the Company's business, each Member shall, and shall cause its representative on the Board to, comply with all applicable laws, including, but not limited to, the following:  (a) federal criminal law; (b) the False Claims Act (31 U.S.C. 3729 *et seq.*); (c) the anti-kickback statute (42 U.S.C. 1320a–7b(b)); (d) the civil monetary penalties law (42 U.S.C. 1320a–7a); (e) the physician self-referral law (42 U.S.C. 1395nn); and (f) federal and state antitrust laws (15 U.S.C. 1 et seq. and 10 M.R.S.A. §§ 1101-1102-A and 5 M.R.S.A. § 207, respectively).  In addition, each Member shall cause its representative on the Board to comply with each and every one of the foregoing laws (collectively, the "Health Care Rules of Conduct").

**Section 2.06    Dissociation.**

(a)    Dissociation.  A Person who withdraws as a Member, or who is expelled as a Member, is "dissociated" as a Member for purposes of the Act.

(b)    Involuntary - Automatic.  A Member shall automatically be dissociated (expelled) as a Member upon any of the following events:

(i)    Such Member ceases to qualify as a Member under Section 2.05(a);

(ii)    Such Member voluntarily or involuntarily transfers, sells, or otherwise disposes of ("Transfers") all of its Interest; or

(iii)    Such Member is dissolved.

4

(c)    Involuntary - Board Determination and Member Vote.  A Member shall be dissociated (expelled) as of the date that the Members by a Super-Majority Vote of the Members approve a proposal to cause that Member to be dissociated following the Board's determination that:

(i)    Such Member is bankrupt;

(ii)    Such Member violated Section 2.05(d);

(iii)    Such Member has defaulted on its obligations to make Capital Contributions and such default has not been cured before December 31 of the year during which the default occurred; or

(iv)    Such Member has failed to cure a material breach of its obligations under its participation agreement with the Company within the thirty (30) day period immediately following the date the Board notifies that Member in writing of such breach.

(d)    Voluntary.  A Person may withdraw voluntarily as a Member by delivering written notice of that withdrawal (a "Withdrawal Notice") to the Board no later than ninety (90) days before the effective date of that withdrawal.  The effective date of a Person's withdrawal as a Member is the later of (i) the last day of the calendar year during which that Person's Withdrawal Notice is delivered to the Board, or (ii) the first day that the Contract Year Condition is satisfied.  The Contract Year Condition is satisfied if and when that Person withdraws from each and every Contract as to which it is a participant, provided that each such withdrawal takes effect as of the last day of a "contract year" of the applicable Contract (as to such Contract, such year is the "Contract Year").  Despite the foregoing provisions of this Section 2.06(d), no Person's withdrawal shall relieve that Person of any obligation that accrued prior to the effective date of withdrawal.  A Person who withdraws in violation of this Section 2.06(d) shall indemnify and hold harmless all other Members against all liabilities and damages arising on account of such Person's dissociation.

(e)    Reasons of Conscience.  If a Member determines in good faith that the activities of the Company or the Member's participation in the Company conflict with or violate the Ethical and Religious Directives for Catholic Health Care Services issued by the United States Conference of Catholic Bishops and promulgated by the Roman Catholic Bishop of Portland (the "ERDs") or another similar policy of conscience applying to that Member, then such Member may voluntarily withdraw as a Member of the Company upon delivery of a Withdrawal Notice. Such Member's withdrawal shall be effective immediately upon the date of the Withdrawal Notice.

(f)    Redemptive Distributions.  Upon a Person's dissociation as a Member, such Person shall be redeemed of its Interests as follows:

(i)    If that Member is expelled under Section 2.06(b), or Section 2.06(c) a redemptive distribution of One Dollar ($1.00); and

(ii)    Otherwise, for that Person's Capital Account balance of that Member as determined on the effective date of withdrawal.  The Company shall have up to one

5

hundred eighty (180) days from the effective date of withdrawal to pay the redemptive distribution to the withdrawing Member.

**Section 2.07    Meetings.**  The annual meeting of the Members shall occur in the month of January, or at another time determined by the Board. Other meetings of the Members may be called at any time at the request of any Member or the Board.  The Chair, or in the case of the death, absence, incapacity or refusal of the Chair, any other officer, shall call any meeting so requested by sending written notice thereof pursuant to Section 2.09.

**Section 2.08    Place of Meetings.**  Meetings of the Members shall be held anywhere in the United States, at such place or places as may be fixed by the Board and stated in the notice of the meeting.

**Section 2.09    Notice of Meeting.**  The Chair shall provide each Member written notice of each meeting of the Members at least seven (7) days before the meeting. Such notice shall state the purpose, date, time, and place thereof.  The Chair shall deliver such notice in accordance with Section 12.07.  The purpose of such meeting may be summarized in the notice, unless the purpose of the meeting is to propose amendments to this Agreement or the Certificate, in which case the notice shall contain the text of each proposed amendment, and state the intended purpose and effect of such amendment.

**Section 2.10    Quorum.**  At any meeting of the Members, a quorum for the transaction of business shall exist if a majority of Members are represented in person or by proxy at the meeting.  If a quorum does not exist, the meeting shall be adjourned upon the motion of any Member present.

**Section 2.11    Action at Meeting.**  Each Member represented in person or by proxy at a meeting at which a quorum is present shall be entitled to one (1) vote upon any question presented for action.

(a)    Except as provided in subsections (b) and (c) of this Section 2.11, the affirmative vote of a majority of the Members ("Majority Vote of the Members") may decide any question properly brought before a meeting of the Members.

(b)    Any question properly brought before a meeting of the Members requiring a "Super-Majority Vote of the Members" may be decided only by the affirmative vote of at least seventy-five percent (75%) of the Members; provided that, for purposes of Section 2.06(c), a Super-Majority Vote of the Members shall mean the affirmative vote of at least seventy-five percent (75%) of the Members represented in person or by proxy (excluding for purposes hereof, the Member on whose expulsion the Members are voting).

(c)    Any question properly brought before a meeting of the Members requiring a "Unanimous Vote of the Members" may be decided only by the affirmative vote of all of the Members.

(d)    The following actions may be approved only by a Super-Majority Vote of the Members:

6

(i)    To expel a Member under Section 2.06(c) (but see Section 2.11(b) above concerning the vote of the Member on whose expulsion Members are voting); and

(ii)    To admit a new Member under Section 2.02(a)(i).

(e)    The following actions are approved only by a Unanimous Vote of the Members:

(i)    A vote to dissolve the Company under Section 10.01(a)(i); and

(ii)    A vote to amend this Agreement under Section 12.03.

**Section 2.12    Action by Consent.**  Any action required or permitted to be taken at any meeting of the Members may be taken without a meeting, if the Members with sufficient voting power to approve such action at a meeting of the Members at which all Members are present shall have signed a consent or consents in writing, setting forth the action so taken, and such writings are filed with the Company records.  A message by e-mail from a Member's e-mail address on file with the Company or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, however transmitted, shall be regarded as signed by the Member for purposes of this Section 2.12.

**Section 2.13    Waiver of Notice.**  Whenever any written notice is required to be given by this Agreement, a waiver of notice signed either before or after the action for which notice is required shall have the effect of written notice.  Attendance at any meeting shall also constitute a waiver of notice unless an objection to the lack of notice is made by the Member at the meeting.

**Section 2.14    Proxy Voting.**  A Member's representative may vote by written proxy executed in writing by such representative.  All proxies shall be filed with the Chair before voting and shall be effective for no more than one (1) year.

## ARTICLE III
## MEMBERS' CAPITAL CONTRIBUTIONS

**Section 3.01    Annual Budget.**  The Board shall prepare an annual operating budget, capital budget, and income statement (collectively, the "Annual Budget") for the Fiscal Year ending December 31, 2015 (the "Original Annual Budget") to be prepared for the Member's review, comment, and approval.  The Original Annual Budget shall be prepared no later than thirty (30) days after the Effective Date. Each Annual Budget for each other Fiscal Year shall be prepared for the Member's review, comment, and approval no later than ten (10) days before the beginning of that year.

7

**Section 3.02   Initial Capital Contributions.**

(a)      Effective Date Contributions.  The initial Capital Contribution of each Member admitted as of the Effective Date shall be an amount equal to the total capital needed by the Company as determined by the Board in accordance with the Original Annual Budget multiplied by that Member's Percentage Interest.  A Member's "Percentage Interest" as of a given time is the quotient of that Member's Attributable Lives as of that time divided by the total Attributable Lives of all Members at that time.

(b)      Definitions.

(i)      The "Attributable Lives" of a Member at a given time means the number of individual covered lives for which that Member and any other corporate affiliate of that Member is responsible under Contracts at that time.  The Board shall determine an appropriate methodology for calculating Attributed Lives for the purposes of determining the initial Capital Contribution Member.  The Board will determine each Member's Attributable Lives as of the beginning of each Fiscal Year.  The Board shall review each Member's Attributable Lives upon the preparation of the Annual Budget.  The Board may review and alter a Member's Attributable Lives based upon a material change in the Member's Attributable Lives.

(ii)     A "Capital Contribution" is a contribution of money or property by a Member to the Company in exchange for (or to increase) that Member's "transferable interest" (as defined in the Act, an "Interest").

(c)      PCHC shall make an additional Capital Contribution in an amount determined in the same manner as the initial Capital Contribution of a Member admitted on the Effective Date. The Capital Contributions determined under this Section 3.02 shall be made as and when established in a schedule issued by the Board for such purpose.

(d)      Initial Contributions of Other Members.  The Board in its discretion shall determine the amount of the initial Capital Contribution of any other Member and how and when such amount is payable.

**Section 3.03   Additional Capital Calls – Annual Funding.**

(a)      Notice to Members.  The Board shall issue a notice for a given Fiscal Year (an "Annual Funding Notice") to each Member that contains a copy of the Annual Budget approved for that Fiscal Year and a call for an additional Capital Contribution equal to the total capital needs as determined under that Annual Budget multiplied by that Member's Percentage Interest (as to such Fiscal Year, that Member's "Annual Funding Amount").

(b)      Funding Schedule.  Each Member shall contribute an amount of cash equal to its Annual Funding Amount according to the schedule set forth in the applicable Annual Funding Notice (a "Funding Schedule").  The Funding Date for a given Fiscal Year shall be as determined by the Board.

8

(c)     Default Remedies. If a Member fails to pay its Funding Amount according to the applicable Funding Schedule, such Member's rights as a Member shall be suspended until the Member's default is cured. In addition, the defaulting Member may be expelled and it Interest redeemed according to Section 2.06(c)(iii) and Section 2.06(e).

### Section 3.04   Additional Capital Contributions – Capital Calls.

(a)     Contribution Notice. The Board may from time to time determine that the cash needs of the Company require additional equity capital. If the Board so determines, the Board shall issue to each Member a notice (a "Contribution Notice") notifying each Member of the call for additional Capital Contributions (a "Capital Call") and such Member's applicable Percentage Interest.

(b)     Contribution Schedule. Each Member shall contribute an amount of cash equal to the total capital to be raised under the Capital Call multiplied by the Member's Percentage Interest as shown in the Contribution Notice (the "Member's Capital Call Amount"). The Member's Capital Call Amount shall be payable according to the schedule in the applicable Contribution Notice (a "Contribution Schedule").

(c)     Default Remedies. If a Member fails to pay the Member's Capital Call Amount according to the Contribution Schedule, such Member's rights as a Member shall be suspended until the Member's default is cured. In addition, the defaulting Member may be expelled and it Interest redeemed according to Section 2.06(c)(iii) and Section 2.06(e).

**Section 3.05   Adjustment to Contributions.** Notwithstanding the provisions of Section 3.03 and Section 3.04, the Board shall appropriately adjust each Member's Annual Funding Amount or Capital Call Amount, as the case may be, to take account of any Member's election to abstain from participating in a Contract under Section 4.02.

**Section 3.06   Return of Capital Contributions.** Except as otherwise provided in this Agreement, each Member shall look solely to the assets of the Company for the return of his or her Capital Contribution and shall have no right or power to demand or receive property other than cash from the Company. Except as may be provided in this Agreement, no Member shall have priority over any other Member as to the return of such Member's Capital Contribution, distributions, or allocations.

**Section 3.07   Right to Withdrawals and Distributions.** Except as may be provided in this Agreement, a Member shall not be entitled to withdraw any part of its Capital Contribution, and no Member shall be entitled to receive any distribution from the Company, except as provided in ARTICLE VII and ARTICLE X.

**Section 3.08   No Implied Compensation Right.** No Member shall receive any Interest, salary, or drawing with respect to his Capital Contributions or his or her Capital Account or for services rendered on behalf of the Company or otherwise in his capacity as Member, except as otherwise provided in this Agreement.

**Section 3.09   No Deficit Restoration Obligation.** Except to the extent of that Member's outstanding funding obligations under Section 3.03 or Section 3.04, a Member shall

9

have no liability to restore any negative capital account balance in such Member's Capital Account, nor shall any negative balance in that Member's Capital Account create any liability on the part of that Member to any other Member or to a third party.

## ARTICLE IV
## PARTICIPATION IN CONTRACTS

**Section 4.01   Contracts.**  The Company shall enter into cost savings and other arrangements with government programs, commercial insurers, and other payors (each such arrangement, a "Contract").  Each Member may participate in each and every Contract, or may elect against participating in one or more Contracts.  Each Member must participate in at least one Contract at all times.  Only a Member that elects to participate in a Contract is eligible to vote on matters pertaining to such Contract.

**Section 4.02   Option to Abstain - Exempt Organization.**  Any Member may abstain from any activity and any financial obligations or benefits related thereto if that Member reasonably determines that activity jeopardizes that Member's status as an organization exempt from federal income tax under Code Section 501 or Code Section 115, or if that Member determines in good faith that such activity conflicts with or violates or would cause such Member to conflict with or violate the ERDs or another similar policy of conscience applying to that Member.

## ARTICLE V
## MANAGEMENT

**Section 5.01   Board of Managers; Authority to Manage.**

(a)      Except as otherwise provided herein, a board of directors of the Company (the "Board" or the "Board of Managers") shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company.

(b)      Notwithstanding the foregoing, the Board shall have no authority to manage or control the business affairs related to any services that a Catholic Hospital is prohibited from providing by the ERDs ("Special Service(s)").  In the event the Company needs to discuss or make a decision related to the management of or control over Special Service(s), full, exclusive and complete discretion to decide and/or review the Special Service(s) matter shall be delegated to Penobscot Community Health Center, Inc., a separate legal entity from the Company.

(c)      The Board of Managers and, to the extent delegated by the Board of Managers, the Company's officers shall have the exclusive power and authority to bind the Company.  The Board of Managers may designate such persons as it shall from time to time select to serve as officers of the Company, with such duties, responsibilities and powers as the Board of Managers shall determine.

(d)      No officer shall take any action or fail to take any action that is contrary to or inconsistent with a specific decision, delegation or directive of the Board of Managers.  Moreover, actions taken by an officer that are in violation of the prohibition contained in the foregoing sentence shall be deemed actions taken in contravention of this Agreement.

10

**Section 5.02    Actions Requiring Super-Majority Vote of Managers.**  No officer or other Person shall have any authority to perform any of the following acts on the Company's behalf unless approved by at least seventy-five percent (75%) of the Managers then in office:

(i)    Amend the Certificate;

(ii)    Cause or permit the Company to engage in any activity that is not consistent with the purposes of the Company as set forth in Section 1.03 hereof;

(iii)    Engage in any activity other than any activity that furthers the Company's participation in a Contract;

(iv)    Enter into or amend a Contract;

(v)    Take any action in contravention of a Contract;

(vi)    Amend or terminate any Contract;

(vii)    Issue a Capital Call;

(viii)    Take any action in contravention of this Agreement.

**Section 5.03    Special Board Votes.**

(a)    Certain Determinations.  Under Section 2.06(b)(i) – (iv), the Board may make determinations as to a Member.  In such cases, the Manager whom that Member appointed shall not participate in the vote taken by which the Board determines the facts or action related to that Member.  In addition, the Manager Vote of the Manager appointed by that Member shall not be counted in determining whether the vote required to approve an action or determine a fact as to such Member has been achieved.

(b)    Contract Participants Only.  The Manager appointed by a Member who abstains from participating in a Contract shall not participate in the vote taken by which the Board determines whether to enter into, amend, terminate, or take any other action as to that Contract.  The Manager Vote of the Manager appointed by that Member shall not be counted in determining whether the vote required to approve an action as to that Contract has been achieved.

**Section 5.04    Number, Appointment, and Removal of Managers.**

(a)    The number of members of the Board (each a "Manager" and, collectively, the "Managers") shall be the same as the number of Members.  Each Member shall appoint one (1) individual to serve as its representative Manager.  To the extent the Company participates in a Medicare Accountable Care Organization ("ACO") contract, one of the Managers shall be a Medicare beneficiary, as required by the ACO regulations at 42 C.F.R. § 425.106(c)(2).  In the event none of the members elects a Manager that is also a Medicare Beneficiary, the Compliance Officer or any other member of the Board of Managers shall nominate an additional Manager who is also a Medicare Beneficiary for approval by the Board of Managers.

11

(b)      Each Manager shall have one (1) vote (each a "Manager Vote") on all matters to be acted upon, by meeting or otherwise, by the Board of Managers.

**Section 5.05   Quorum and Action by Managers.**

(a)      At all meetings of the Board of Managers, the presence in person or by proxy of a majority of Managers, shall be necessary to constitute a quorum for the transaction of business. Subject to the provisions of Section 5.02, the vote of a majority of Managers cast at any meeting at which there is a quorum shall be the act of the Board.  Any Manager may waive attendance at a meeting and affirmatively agree to be deemed present for purposes of constituting a quorum. Any proxy or waiver of attendance granted by a Manager shall be in writing and shall be valid only for one meeting of the Board of Managers.

(b)      If a quorum shall not be present at any meeting of the Managers, the Managers present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.  At any such subsequent meetings, any business may be transacted that might have been transacted at the meeting as originally convened, without additional notice.

**Section 5.06   Meetings of the Board of Managers.**

(a)      Regular meetings of the Board of Managers, of which at least seven (7) business days advance written notice shall be necessary, shall be held at such times and places as may be fixed from time to time by resolution adopted by the Board of Managers.  If within forty-eight (48) hours prior to the scheduled meeting time a Manager or the Member who appointed such Manager notifies the Chair that the Manager will not be able to attend, and that Manager's absence together with other known absences from the meeting cause the Chair to reasonably believe that a quorum for that scheduled meeting will not be achieved, then the Chair shall make reasonable efforts to reschedule the meeting for a time not more than seventy-two (72) hours following the initially scheduled meeting.  The Chair shall promptly provide a written copy of each resolution to any Manager who was not present at the meeting of the Board of Managers at which such resolution was adopted.  Any and all business that may be performed by the Board of Managers hereunder may be transacted at any regular meeting.

(b)      Special meetings of the Board of Managers may be called by twenty percent (20%) of the Members or by the Managers representing them, by giving written notice thereof to the other Members and Managers.  Such notice of a special meeting of the Board of Managers shall state the time, date and purpose or purposes of the proposed meeting, and it shall be given to the other Members and Managers so that it is actually received no less than five (5) business days, and no more than sixty (60) calendar days, prior to the date of the meeting.

(c)      Any action required or permitted to be taken at any meeting of the Managers may be taken without a meeting, if at least a majority of Managers shall have signed a consent or consents in writing, and such writings are filed with the minutes of proceedings of the Board of Managers.  A message by electronic mail from a Manager's email address on file with the Company or similar transmission by a Manager, or a photographic, photostatic, facsimile or

12

similar reproduction of a writing signed by a Manager, however transmitted, shall be regarded as signed by the Manager for purposes of this Section 5.06.

(d)     Subject to the provisions of applicable law and this Agreement regarding notice of meetings, one or more members of the Board of Managers may participate in a meeting of the Board of Managers by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this Section 5.06(d) shall constitute presence in person at such meeting, except when a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

(e)     All meetings of the Board of Managers shall be closed to all Persons except for Managers, Members and any Person invited to attend such meeting by the Board of Managers.

**Section 5.07   Committees.**

(a)     The Board of Managers shall designate two (2) standing Board committees.  The Board designates the following standing committees:

(i)     The Finance and Operations Committee.  The Finance and Operations Committee shall supervise and report to the Board on matters concerning the Company's finances, including the Company's capital needs, from time to time.  In addition, the Finance and Operations Committee shall discuss and make recommendations as to strategic, governance, operational matters, and Contract terms.  The Finance and Operations Committee shall be comprised exclusively of Managers and members of senior management of one or more Members;

(ii)    The Quality and Clinical Integration Committee.  The Quality and Clinical Integration Committee shall supervise and report to the Board as to the Company's (A) compliance with performance standards established by the Company in accordance with the Contracts, and (B) the requirements for accessing performance data of participating Providers that relate to utilization review and quality management, and (C) such other related functions, criteria and processes as may be useful to enhance the appropriateness, medical necessity, cost effectiveness, consistency of quality or outcomes of health care services provided by participating Providers, and other providers of care who provide services on behalf of the Company.  The Quality and Clinical Integration Committee shall be comprised exclusively of members of the Board, members of the boards of directors of one or more Members, and at least two (2) MaineCare members or their guardians or caregivers as required by the MaineCare Accountable Communities Program, members of senior management of one or more Members, and one or more Physicians.

(b)     The Board of Managers may, by resolution passed by a majority of the Managers, designate one (1) or more committees in addition to those committees described in Section 5.07(a).  Each such committee shall consist of one (1) or more of the Managers of the Company, unless the Board otherwise expressly determines.

13

(c)    The Board of Managers may designate one (1) or more Managers as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  Notwithstanding the foregoing, the Manager appointed by PCHC shall have the right to serve on any committee designated by the Board of Managers.

(d)    Any such committee, to the extent provided in the resolution of the Board of Managers, shall have and may exercise all the powers and authority of the Board of Managers in the management of the business and affairs of the Company, except for any matters described in Section 5.02.  Each committee formed under the authority of Section 5.07(b) shall have such name or names as may be determined from time to time by resolution adopted by the Board of Managers.  Each committee shall keep regular minutes of its meetings and report the same to the Board of Managers when required.

### Section 5.08    Compensation; Reimbursement; Insurance

(a)    The Managers shall not receive or be entitled to receive any compensation from the Company for their service as such.  Nothing herein contained shall be construed to preclude any Manager from serving the Company as an officer or in any other capacity and receiving compensation therefor.

(b)    Any direct and reasonable costs and expenses incurred by the Managers and their designated representatives in connection with the business and affairs of the Company and in connection with the performance of their duties as Managers pursuant to the terms of this Agreement, including, without limitation, travel expenses and costs, may be paid or reimbursed by the Company as a Company expense if such payment or reimbursement is approved in accordance with this Section.  All such requests for reimbursement by the Managers shall be accompanied with appropriate written documentation, including the purpose or purposes for the incurrence of such costs and expenses.  Any expense reimbursement request for an amount of $5,000 or less shall be paid only if approved by the CEO or the CEO's designee, provided such expense was included in the Annual Budget.  Any expense reimbursement request for an amount in excess of $5,000 shall be paid only if approved by the CEO or the CEO's designee and the Board for such purpose.

(c)    The Company shall obtain and cause to be maintained in effect, with financially sound insurers, a policy of directors' and officers' liability insurance in an amount of $1,000,000 per claim, and $3,000,000 in the annual aggregate.

### Section 5.09    Officers.

(a)    Promptly following the Effective Date, the Board of Managers shall elect from among its members two (2) individuals, one (1) to serve as Board Chair (the "Chair") and the other to serve as Treasurer.  The initial term for each of these offices shall end December 31, 2016.  Thereafter, each successive term for each such office shall last one (1) calendar year. The Board shall meet at least annually to elect the individuals to serve in these offices for the then immediately following year.

(b)    In addition to electing officers under Section 5.09(a), the Board of Managers shall designate individuals to serve, at the pleasure of the Board, as Chief Executive Officer (the

14

"CEO"), Chief Medical Officer (the "CMO"), and Compliance Officer (the "CO"). The CMO is authorized and directed to supervise all clinical aspects of the Company's activities. The CO is authorized and directed to supervise the Company's compliance with the Health Care Rules of Conduct. In all other cases, the assignment of a title shall constitute the delegation to such Person of authorities and duties that are normally associated with that office in a business corporation. The CEO shall report directly to the Board. All other officers appointed under Section 5.09 shall report directly to the CEO.

(c)    The Board may, in its discretion, create an office, define the authority and duties of that office, and appoint an individual to serve in that office. All such individuals serve at the pleasure of the Board. Further, the Board may eliminate any such office at any time for any reason or no reason.

(d)    Any officer may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board. Any vacancy occurring in any office of the Company may be filled by the Board.

**Section 5.10    Records and Reports.** The Board shall cause the CEO to keep, at the principal place of business of the Company, or at such other location as the Board reasonably deems appropriate, such financial data, minutes of the Board, and such communications with Members for the current Fiscal Year and the immediately past seven (7) Fiscal Years as the Board deems appropriate.

**ARTICLE VI**
**DUTIES, LIABILITY, AND INDEMNIFICATION**

**Section 6.01    Duties Generally.**

(a)    Duties. Each Member, Manager and officer (each, a "Responsible Person") shall have the obligation to discharge its duties to act for and on behalf of the Company:

(i)    in good faith;

(ii)    refraining from grossly negligent conduct, and intentionally or reckless misconduct;

(iii)    in compliance with Health Care Rules of Conduct;

(iv)    in compliance with the Company's conflict of interest policy and procedures established by the Board;

(v)    in compliance with any policies and procedures on confidentiality established by the Board; and

(vi)    in compliance with the restrictions set forth in Section 6.02 below.

15

(b)      Exclusivity.  The foregoing is an exclusive list of duties owed by a Responsible Person as such.  The Members intend that, except for the duties listed in this Section 6.01, all duties (including fiduciary duties) that would otherwise apply to a Responsible Person, either at law or in equity, are unconditionally and completely waived by the Company and the Members.

(c)      Waiver of Certain Duties.  Despite any provisions of this Agreement to the contrary, to the maximum extent permitted by applicable law, neither a Member nor any person appointed by a Member as a Manager or member of any committee shall be required to support any actions or operations or proposed actions or operations of or with respect to the Company that the Member or such person appointed by the Member determines in good faith are inconsistent with or violate the ERDs, or such other similar policy of conscience applying to that Member, and the Member and each such person appointed by the Member may take into consideration the ERDs or other similar policy of conscience applying to that Member when voting on matters or otherwise carrying out the responsibilities of the Member or such person under this Agreement or under law.

(d)      Not Apply to Members as Such.  Except as otherwise provided in this Agreement, this Section 6.01 shall not apply to a Member acting solely in its capacity as a Member.

**Section 6.02    Restrictions on Use or Benefit of Company Assets.**  No Manager or officer or any other private individual other than a Member shall receive at any time any of the net earnings or pecuniary profit from the operations of the Company, provided that this shall not prevent the payment to any such person of such reasonable compensation for services rendered to or for the Company in effecting any of its purposes as shall be fixed by the Board; and no Person other than a Member, as such, shall be entitled to share in the distribution of any of the Company assets upon the dissolution and winding up of the Company.  All Managers shall be deemed to have expressly consented and agreed that upon such dissolution or winding up of the affairs of the Company, whether voluntary or involuntary, the assets of the Company, after all debts have been satisfied, then remaining in the hands of the Board of Managers shall be distributed, transferred, conveyed, delivered, and paid over according to the provisions of Section 10.02.

**Section 6.03    Liability.**  No Responsible Person shall be liable to the Company or to any Member for any conduct in its capacity as such unless such Responsible Person engaged in conduct that constitutes gross negligence, or intentional or reckless misconduct.

**Section 6.04    Indemnification.**

(a)      Indemnification.  The Company shall indemnify and hold harmless each Member, each Manager, officer, and all officers, directors, managers, and employees of any of the foregoing (individually, an "Indemnitee"), to the full extent permitted by law, from and against any and all losses, claims, demands, costs, damages, liabilities, joint and several, expenses of any nature (including reasonable attorneys' fees and disbursements), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which the Indemnitee may be involved, or threatened to be involved as a party or otherwise, relating to the performance or nonperformance of any act as a Member, Manager, officer, director, manager, or employee (as the case may be) concerning

16

the activities of the Company (each such item, a "Claim"), provided that no indemnification shall be provided for any Indemnitee with respect to any matter as to which such Indemnitee shall have been finally adjudicated in any action, suit or proceeding not to have engaged in conduct that constitutes gross negligence, or intentional or reckless misconduct. The termination of an action, suit or proceeding by judgment, order, settlement, or upon a plea of nolo contendere or its equivalent, shall not, in and of itself, create a presumption or otherwise constitute evidence that the Indemnitee engaged in conduct that constitutes gross negligence, or intentional or reckless misconduct.

(b)    Advances to Defend Claims. Expenses incurred by an Indemnitee in defending any claim, demand, action, suit or proceeding subject to this Section 6.04 shall, to the full extent permitted by law, be advanced by the Company prior to the final disposition of such claim, demand, action, suit, or proceeding upon receipt by the Company of a written commitment by or on behalf of the Indemnitee to repay such amount if it shall be determined that such Indemnitee is not entitled to be indemnified as authorized in this Section 6.04.

(c)    No Member Obligation to Fund Indemnity. Any indemnification provided under this Section 6.04 shall be satisfied solely out of the assets of the Company, as an expense of the Company. No Member, Manager or officer shall be subject to personal liability by reason of these indemnification provisions.

(d)    Limit on Indemnity. Despite the foregoing provisions, no Indemnitee shall be entitled to indemnification under this Section 6.04 if the Indemnitee is seeking indemnification for a Claim as to which the Indemnitee is adverse to the Company.

(e)    No Third-Party Rights. The provisions of this Section 6.04 are for the benefit of the Indemnitees and shall not be deemed to create any rights for the benefit of any other Person.

## ARTICLE VII
## DISTRIBUTIONS

**Section 7.01    Contract Distributable Cash.** The Company shall maintain a separate cash account for each Contract. Under this accounting, the cash revenue and cash expenses shall be allocated to each Contract by the Board. The Board shall have sole discretion in allocating the Company's cash revenue and cash expenses. "Contract Distributable Cash" means, as to a given Contract, the revenue allocated to that Contract, reduced by Company cash expenses, debt payments, and contingencies allocated to that Contract plus reasonable reserves established for the foregoing, all as determined by the Board. Contract Distributable Cash shall not be reduced by depreciation, amortization, cost recovery deductions or similar noncash allowances.

**Section 7.02    Distributions of Contract Distributable Cash.**  As to a given Contract, the Board may, in its discretion, cause the Company to distribute the applicable Contract Distributable Cash to the Members participating in that Contract at any time, provided that all such Contract Distributable Cash must be distributed within the ninety (90) day period immediately following the Company's receipt of the Contract Distributable Cash.  Any distributions of that Contract Distributable Cash shall be distributed to the Members participating in that Contract according to their applicable Contract Percentage Interests as of the time of the distribution.

**Section 7.03    Limitations on Distributions.**  A Member may not receive a distribution from the Company to the extent that such distribution would be prohibited under the Act.

## ARTICLE VIII
## ALLOCATIONS

**Section 8.01    Contract Profits and Contract Losses.**  The Company shall maintain separate financial and tax accounting for each Contract as though the activities related to each Contract were the activities of a business entity established solely for that Contract.  To that end, the Board shall allocate the Company's income, deductions, gains, losses, and credits among the Contracts accordingly.  The income, deductions, gains, losses, and credits so allocated to a Contract shall produce for that Contract either a Contract Profit or a Contract Loss for the Allocation Year in which the Company realizes such items under its accounting method.

**Section 8.02    Contract Profits.**  After giving effect to the special allocations in Section 6.02 hereof, Contract Profits for any Allocation Year as to a given Contract shall be allocated among the Members according to their applicable Contract Percentage Interests as of the end of such Allocation Year.

**Section 8.03    Contract Losses.**  After giving effect to the special allocations in Section 6.02 hereof, Contract Losses for any Allocation Year as to a given Contract shall be allocated:

(a)    First among the Members participating in that Contract according to their respective Capital Account balances to the extent thereof; and

(b)    The balance, in accordance with their applicable Contract Percentage Interests as of the end of such Allocation Year.

**Section 8.04    Special Allocation.**  Items of income, deduction, loss, and gain for a given Allocation Year shall be allocated as follows:

(a)    Items of income or gain for any Allocation Year shall be allocated to the Members in the manner and to the extent required by the "qualified income offset" provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(*d*); and

(b)    Items of deduction shall be specially allocated to Members whose status as a Member ended on or before the end of that Allocation Year in proportion to and to the extent of their respective Capital Account balances minus, in each case, One Dollar ($1.00).

18

**Section 8.05    Curative Allocations.** The allocations of Section 8.04(a) (the "Regulatory Allocations") are intended to comply with certain requirements of Regulation § 1.704-1. Notwithstanding any other provision of this ARTICLE VIII (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Contract Profits and Contract Losses and other items of income, gain, loss and deduction among the Members so that, to the extent possible, the net amount of the allocations of Contact Profits and Contract Losses and other items and the Regulatory Allocations to the Members shall be equal to the net amount that would have been allocated to them if the Regulatory Allocations had not occurred. The Board shall allocate pursuant to this Section 8.05 for the purpose of minimizing any distortions of the sharing of economic returns that might otherwise result from the application of the Regulatory Allocations. For purposes of this provision, the Members intend that the sharing of economic returns from the Company be consistent with how cash items are allocated and distributed under ARTICLE VII. Accordingly, such offsetting allocations shall be made so as to achieve the intent of the Members that the Capital Account of each Member shall, at any relevant date, equal the amount such Member would receive under if the Company's assets were sold for their Asset Value on such date and the proceeds of such sale were distributed pursuant to such section on such date.

## ARTICLE IX
## TRANSFERS

**Section 9.01    Restrictions on Transfers.** Except as approved by the Board, no Member shall Transfer all or any portion of its Interest. No Member may pledge or otherwise encumber its Interests.

**Section 9.02    Prohibited Transfers.** Any purported Transfer of Interest that is not a Permitted Transfer shall be null and void and of no force or effect whatever. In the case of a Transfer or attempted Transfer of Interest that is not a Permitted Transfer, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that the Company or any of such other Members may incur (including, without limitation, incremental tax liabilities, lawyers' fees, and expenses) as a result of such sale or attempted sale and efforts to enforce the indemnity granted hereby. The foregoing indemnity augments and does not limit other legal or equitable rights or remedies that the Company and/or any Members may have or to which they would be entitled in the event of such a Transfer or attempted Transfer.

**Section 9.03    Admission of Substituted Members.** Subject to the other provisions of this ARTICLE IX, a transferee of an Interest may be admitted to the Company as a substituted Member only if such admission is approved by the Super-Majority Vote of Members.

19

## ARTICLE X
## DISSOLUTION AND WINDING UP

**Section 10.01 Dissolution Events.**

(a)    Dissolution. The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each a "Dissolution Event"):

(i)    Upon the unanimous vote or consent of the Members in favor of dissolving, winding up, and liquidating the Company; or

(ii)    A judicial determination of a court of competent jurisdiction that an event has occurred that makes it unlawful, impossible or impractical to carry on the purposes of the Company.

(b)    The Members hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of a Dissolution Event.

**Section 10.02 Winding Up.** The Board shall be responsible for overseeing the winding up and dissolution of the Company, which winding up and dissolution shall be completed within the one hundred eighty (180) day period commencing on the date of the applicable Dissolution Event or, if applicable, the date of a judicial determination described in clause (ii) above. After satisfying and establishing reserves for claims of creditors according to the Act, the Board shall distribute the balance to the Members in accordance with their Capital Account balances.

## ARTICLE XI
## BOOKS, RECORDS, AND FINANCIAL TERMS

**Section 11.01 Records and Accounting.** The CEO shall establish and maintain books and records of the Company in compliance with the Act. The Members shall have access to the books and records as provided under the Act.

**Section 11.02 Tax Matters.** The Board shall, without any further vote or consent of the Members being required (except as specifically required herein), make any and all elections for federal, state, local, and foreign tax purposes. At any given time, the Member that employs the Person then holding the office of Treasurer is specifically authorized to act as the "Tax Matters Partner" under the Code and in any similar capacity under state or local law. The Company's income tax returns filed with the Internal Revenue Service and applicable state tax administrators shall be signed by the Member serving as Tax Matters Partner at the time of filing.

**Section 11.03 Certain Terms.** In addition to the terms defined elsewhere herein, the following terms are, for purposes of this Agreement, defined as follows:

"Allocation Year" shall mean, with respect to an allocation, the taxable year of the Company, determined according to Code Section 706 (taking into account, as applicable, Code Section 706(c)), as to which such allocation is made.

20

"Asset Value" means as to any asset, the asset's adjusted basis for Federal income tax purposes, except as follows:

(a)    The initial Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Board provided that the initial Asset Values of the assets contributed to the Company shall be as set forth in Schedule A hereof.

(b)    The Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as determined by the Board as of the following times:  (i) the acquisition of an additional Interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an Interest in the Company; (iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and (iv) at such other times as the Board determines to be consistent with the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv)(f)(5)(iv).  Such adjustments shall be made at such times provided in clauses (i), (ii), and (iii) of this subsection unless the Board reasonably determines that such adjustment is not necessary to reflect the relative economic interests of the Members in the Company.

(c)    The Asset Value of any item of Company assets distributed to any Member shall be adjusted to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset on the date of distribution as determined by the Board.

(d)    The Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Asset Values shall not be adjusted pursuant to this subparagraph (d) to the extent that an adjustment pursuant to subparagraph (b) is made.

"Capital Account" means, with respect to any Member, the Capital Account maintained for such Member in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv), provided that, in the event the Board shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or any Members), in order to comply with such Regulations, the Board shall cause such modification to be made, provided that it is not likely to have a material effect on the amounts distributed to any person pursuant to Section 10.02 hereof upon the dissolution of the Company.

"Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Asset Value of an asset is different from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Asset Value as the

21

federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis.

"Fiscal Year" means (i) the period commencing on the date the Company was formed and ending on December 31, 2015, (ii) the period ending on the date on which all Company property is distributed to the Members pursuant to Article VIII hereof and commencing on the immediately preceding January 1, and (iii) any period following December 31, 2015, commencing on any January 1 and ending on the immediately following December 31 that elapses between the periods described in clauses (i) and (ii) of this definition.

"Contract Profits" and "Contract Losses" means, for each Allocation Year or other period, an amount equal to the Company's taxable income or loss for such year or period allocated to a given Contract by the Board determined in accordance with Code Section 703(a) (for this purpose, taxable income or loss shall include all items required to be stated separately pursuant to Code Section 703(a)(1)), with the following adjustments:

(a)     Any income that is exempt from federal income tax and not otherwise taken into account in computing Contract Profits or Contract Losses pursuant hereunder shall be added to such taxable income or loss;

(b)     Any expenditures described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures allocated to that Contract, and not otherwise taken into account in computing Contract Profits or Contract Losses hereunder, shall be subtracted from such taxable income or loss;

(c)     Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Asset Value;

(d)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, determined in accordance with this definition; and

(e)     Notwithstanding any other provision of this definition, any items which are specially allocated for income tax purposes pursuant to the provisions of this Agreement shall not be taken into account in computing Contract Profits or Contract Losses.

## ARTICLE XII
### MISCELLANEOUS

**Section 12.01  Creditor Restriction.**  Except to the extent required under the Act, none of the provisions of this Agreement shall be for the benefit of or be enforceable by any creditor of the Company.

**Section 12.02  Binding Effect.**  This Agreement shall inure to the benefit of and be binding upon the parties and their respective administrators, successors and assigns.  If one or

22

more of the provisions of this Agreement or any application thereof shall be invalid, illegal, or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein, and any other application thereof, shall not in any way be affected or impaired thereby.

**Section 12.03  Amendments.**  This Agreement may be modified or amended only in a writing and only with the unanimous consent of the Members.

**Section 12.04  Entire Agreement.**  This Agreement and the Schedule and Exhibits attached hereto constitute the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith which conflict with the express terms of this Agreement.

**Section 12.05  Applicable Law.**  This Agreement shall be construed and enforced in accordance with and be governed by the laws of the State of Maine, without regard to such state's rules concerning conflicts of law.

**Section 12.06  Counterparts.**  This Agreement may be executed in one or more counterpart versions which collectively shall constitute a single original version.

**Section 12.07  Notices.**  All notices, approvals, consents or other communications hereunder shall be in writing and signed by the party giving the same.  For purposes hereof, a notice, approval, consent or other communication transmitted by electronic mail shall be deemed to be in writing and signed by the sender thereof.  Notices, approvals, consents or other communications shall be deemed to have been given when the same are (i) transmitted to the last email address provided to the Board for the recipient thereof, (ii) deposited in the United States mail and sent by certified or registered mail, postage prepaid, or (iii) hand-delivered, in the cases described in clause (ii) and (iii), to the parties at the address as such parties may designate by notice to the Company:

(a)    If to the Company, at the principal office of the Company.

(b)    If to a Member, at the address set forth in Schedule A hereto, or to such other address as may be designated by notice from such Member.

*[the balance of this page was left blank intentionally]*

23

## SCHEDULE A

## COMMUNITY CARE PARTNERSHIP OF MAINE, LLC
### AMENDED AND RESTATED
### LIMITED LIABILITY COMPANY AGREEMENT

## MEMBERS AND INTERESTS

**Last Updated: May 22, 2015**

TOTAL ESTIMATED ATTRIBUTABLE LIVES: 52,227 (without SJH)
Mainecare Attributable Lives: 35,274
Medicare Attributable Lives: 16,953

| Name | Capital Contribution | Percentage Interest |
|---|---|---|
| Islands Community Medical Service<br>15 Medical Center Loop<br>Vinalhaven, Maine 04863 | | .36% |
| Katahdin Valley Health Center<br>P.O. Box 500<br>Patten, Maine 04765-0500 | | 6.7% |
| Mayo Regional Hospital<br>897 West Main Street<br>Dover-Foxcroft, Maine 04426 | | 10.6% |
| Millinocket Regional Health<br>200 Somerset Street<br>Millinocket, Maine 04462 | | 4% |
| Penobscot Community Health Center<br>P.O. Box 2100<br>Bangor, Maine 04402-2100 | | 42% |
| Penobscot Valley Hospital<br>P.O. Box 368<br>7 Transalpine Road<br>Lincoln, Maine 04457-0368 | | 1.8% |
| Pines Health Services<br>c/o Administration<br>P.O. Box 40<br>Caribou, Maine 04736 | | 13.4% |
| Portland Community Health Center<br>180 Park Avenue<br>Portland, Maine 04102 | | 3.8% |

## SCHEDULE A

**COMMUNITY CARE PARTNERSHIP OF MAINE, LLC
AMENDED AND RESTATED
LIMITED LIABILITY COMPANY AGREEMENT**

**MEMBERS AND INTERESTS**

| Name | Capital Contribution | Percentage Interest |
|---|---|---|
| D.F.D. Russell Medical Center, Inc.<br>180 Church Hill Road, Suite 1<br>Leeds, Maine 04263 | | 3.6% |
| Sebasticook Family Doctors<br>118 Moosehead Trail, Suite 5<br>Newport, Maine 04953 | | 10.5% |
| York County Community Action Corporation<br>P.O. Box 72<br>Sanford, Maine 04073 | | 3.0% |

**EXHIBIT 2.02**

**COMMUNITY CARE PARTNERSHIP OF MAINE, LLC**
**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**

**JOINDER AGREEMENT**

Reference is hereby made to the Limited Liability Company Agreement of Community Care Partnership of Maine, LLC, a Maine limited liability company (the "Company"), dated as of _May 28_ , 2015 (the "LLC Agreement") and executed by the Members admitted as of that date and any other Members who were admitted after that date.

[NEW MEMBER] hereby acknowledges that it has received and reviewed a complete copy of the LLC Agreement and agrees that upon execution of this Joinder, it shall become a party to the LLC Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the LLC Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto.

The parties agree that as of the date hereof, Schedule A of the LLC Agreement shall be as provided in the attached Exhibit A of this Joinder.

This Joinder may be executed in one or more counterparts with the same effect as if all parties to this Joinder had signed the same document. All counterparts shall be construed together and shall constitute one complete original agreement.

Capitalized terms used herein without definition shall have the meanings ascribed thereto in the LLC Agreement.

*[signatures on following page]*

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

KATAHDIN VALLEY HEALTH CENTER

By:_____
Name:
Title:

PINES HEALTH SERVICES

By:_____
Name:
Title:

D.F.D. RUSSELL MEDICAL CENTER, INC.

By:_____
Name:
Title:

PORTLAND COMMUNITY HEALTH CENTER

By:_____
Name:
Title:

ISLANDS COMMUNITY MEDICAL SERVICE

By:_____
Name:
Title:

Signature Page
Community Care Partnership of Maine, LLC
Amended and Restated Limited Liability Company Agreement

SEBASTICOOK FAMILY DOCTORS


By:_____
Name:
Title:


YORK COUNTY COMMUNITY ACTION
CORPORATION

By:_____
Name: BARBARA CRIDER
Title: EXECUTIVE Director


PENOBSCOT COMMUNITY HEALTH CENTER


By:_____
Name:
Title:


MILLINOCKET REGIONAL HOSPITAL


By:_____
Name:
Title:


PENOBSCOT VALLEY HOSPITAL


By:_____
Name:
Title:


Signature Page
Community Care Partnership of Maine, LLC
Amended and Restated Limited Liability Company Agreement

H.A.D. #4, d/b/a MAYO REGIONAL HOSPITAL

By:_____
Name:
Title:

Signature Page
Community Care Partnership of Maine, LLC
Amended and Restated Limited Liability Company Agreement